[Crim. No. 6141. Second Dist., Div. Three. Feb. 26, 1959.]

THE PEOPLE, Respondent, v. JAMES H. MORRISON, Appellant.

David H. Caplow for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused in seven counts with violating section 26104, subdivision (a), of the Corporations Code, and he was accused in four counts with grand theft. In a jury trial, he was convicted on six counts (counts 1, 3, 5, 7, 8, and 10), and acquitted on one count, of violating said section of the Corporations Code; and he was acquitted on the grand theft counts. He appeals from the judgment and the order denying his motion for a new trial.

In count 1, defendant was accused of violating "section 26104(a)" of the Corporations Code in that about July 11, 1955, he unlawfully engaged "in the business of buying and selling, offering for sale, and negotiating for the sale of securities and purchasing securities with the purpose of reselling them to the public as defined in Section 25006 of the Corporations Code, in that the defendant did on or about said date sell and offer for sale and cause to be sold, for value, to wit, Five Hundred and 00/100 Dollars ($500.00), to George Neikrug, a security, to wit, shares of stock in a company known as and called Stadia Oil and Uranium Corporation, a corporation, organized under the laws of the state of Nevada,

for profit, without first having applied for and secured from the Commissioner of Corporations of the State of California, a license so to do.''

The other five counts on which defendant was convicted were identical with count 1, except as to dates, names of purchasers, and amounts.[1] The dates alleged in those counts were July 14, 15, 23, and 25, 1955.

Stadio Oil and Uranium Corporation was organized under the laws of Nevada on August 4, 1954. It never applied for or received a permit to sell shares of its stock in California. In 1955 defendant was a tax consultant in Beverly Hills, California. He never applied for or received a broker's license to sell securities in California.

About the dates set forth in the information, the persons named therein as purchasers mailed or delivered, to defendant in Los Angeles County, checks in the respective amounts as set forth in the information (ranging from $500 to $4,200). Thereafter defendant delivered, to the respective purchasers, certificates representing shares of stock of Stadia Oil and Uranium Corporation, which shares he had sold to them at the price of $2.00 a share. The date on some of the certificates was July 20, 1955, and the date on the other certificates was July 29, 1955.[2]

Appellant states that he has never denied that he sold stock issued by Stadia. He asserts that the evidence shows that he was the owner of the stock which he sold; that as such owner he was exempt, under section 25152 of the Corporations Code, and under the due process and equal protection of the law provisions of the federal and state Constitutions, from a statutory requirement that a seller of securities should have a license in order to sell them.

---

[1]*Count*

| Count | Date of Purchase | Name of Purchaser | Amount |
|---|---|---|---|
| 3 | July 15, 1955 | Dr. W. John Pangman | $2,000 |
| 5 | July 14, " | Stanley L. Marlowe | 4,200 |
| 7 | July 25, " | Ada Bell | 1,000 |
| 8 | July 25, " | Anne Pratt | 3,000 |
| 10 | July 23, " | Taylor Holmes | 1,000 |

[2]The dates of the certificates, names of owners, and number of shares were:

| Date | Name | Number of Shares |
|---|---|---|
| July 20, 1955 | George Neikrug | 250 |
| July 20, " | John Pangman | 1,000 |
| July 20, " | Stanley Marlowe | 2,100 |
| July 29, " | Ada E. Bell | 500 |
| July 29, " | Anne Pratt | 1,500 |
| July 29, " | Taylor Holmes | 500 |

George Neikrug, the purchaser referred to in count 1, testified that he is a musician; defendant had been his tax consultant since 1950, and they had had ''dealings'' in connection with uranium properties in Wyoming; about July 1, 1955, defendant said that, in the course of his work concerning the Wyoming properties, he performed services for persons who were making available to him some stock which was worth $5.00 a share and which was going on the market at $5.00 a share; he also said that, by reason of a mistake of a secretary, he could obtain the stock for $2.00 a share in return for the services he had performed, and that the stock would go to all the persons who were connected with the uranium deals in Wyoming; he also said that stock in the company would cost the witness $2.00 a share, and that the stock was going to open on several stock exchanges throughout the country in 30 days at $5.00 a share; a few days after July 1 defendant told him that there was a limited amount of stock available.

Mr. Neikrug testified further that on July 11, 1955, he paid $500 to defendant for 250 shares of the Stadia stock, and several days later he received a certificate for those shares; on July 26, 1955, he paid $700 to defendant for 350 shares of the stock, and thereafter he received a certificate for those shares; on August 2, he paid $400 to defendant for 200 shares of the stock, and thereafter he received those shares; on August 26, he paid $800 to defendant for 400 shares of the stock, and thereafter he received those shares; about August 26, upon behalf of Samuel Neikrug, he paid $5,000 to defendant for 2,500 shares of the stock, and thereafter Samuel Neikrug received those shares; about August 26, upon behalf of Alexander Neiman, he paid $200 to defendant for 100 shares of the stock, and thereafter Neiman received those shares; about August 26, upon behalf of Israel Baker, he paid $2,000 to defendant for 1,000 shares of the stock, and thereafter he (witness) received those shares for Baker. The certificates of stock referred to in the above testimony of Neikrug were issued, in the names of said purchasers, by Stadia. Mr. Neikrug testified further that on October 4, 1955, he paid $2,400 to defendant for 1,200 shares of Stadia stock. A few weeks thereafter he asked the defendant why the certificates had not been delivered. Defendant said that the certificates were tied up in Salt Lake City and that he would get them. On several subsequent occasions Neikrug made similar inquiries of defendant, and defendant made similar replies. About February, 1956, he received three certificates representing

1,200 shares of the stock. Two of those certificates had been issued in the names of defendant and Zona Bell; and one of those certificates had been issued in the name of Zona Bell.[3] Those certificates were assigned to Neikrug.

Dr. John Pangman, the purchaser referred to in count 3, testified that he is a plastic surgeon; he met defendant in January, 1955, and soon thereafter he gave checks to defendant to purchase percentage interests in uranium claims in Wyoming; about July 15, 1955, defendant told him: that on account of favors he had done for the officers of Stadia, they had made available to him a block of 40,000 shares of Stadia stock, and he could sell the stock for $2.00 a share; there were 200,000 shares of founders' stock and approximately 100,000 shares were to be sold; the stock had been cleared by the Securities and Exchange Commission and would be sold in all of the states and Canada for $5.00 a share; the stock would go on the market in about two weeks. He also testified that on July 15 he paid $2,000 to defendant for 1,000 shares of Stadia, and several days later he received a certificate for those shares.

Stanley Marlowe, the purchaser referred to in count 5, testified that he is an actor; he met defendant in June, 1955; on June 14, 1955, defendant called him by telephone and said that the Stadia company was allowing him to sell some stock to his friends for $2.00 a share; the stock was a sure thing and would come on the market on August 25 or 27 at $5.00 a share; the stock had been approved by the Securities and Exchange Commission to be sold at Chicago, Los Angeles, and Toronto. He also testified that on July 14 he paid $4,200 to defendant for 2,100 shares of Stadia, and several days later he received a certificate for those shares.

Anne Pratt, the purchaser referred to in count 8, testified

---

[3]The numbers and dates of certificates, and names of owners, and number of shares, referred to in the testimony of Neikrug were as follows:

| Number | Date | Owner | Number of Shares |
|---|---|---|---|
| 54 | July 29, 1955 | George Neikrug ........... | 350 |
| 72 | August 19, " | George Neikrug ........... | 200 |
| 103 | September 3, . " | George Neikrug ........... | 400 |
| 99 | September 3, " | Samuel Neikrug ...........| 2,500 |
| 104 | September 3, " | Alexander Neiman ......... | 100 |
| 102 | September 3, " | Israel Baker ..............| 1,000 |
| 88 | August 19, " | James H. Morrison and Zona G. Bell ..........| 1,000 |
| 119 | September 20, " | Zona Gale Bell ............ | 100 |
| 121 | September 20, " | Zona Gale Bell and James H. Morrison ........ | 100 |

that she is a schoolteacher; in July, 1955, she called defendant by telephone and asked him if she could buy into a uranium business; defendant said that he had something much better, that he could get stock for her in the Stadia corporation for $2.00 a share, that the stock would go on the market in three weeks at $5.00 a share and all the stock had been "spoken for." She testified further that, about four days later, she and Mrs. Bell had a conversation with defendant wherein he repeated the statements he had made previously, and he also said that he would have to go to Utah to get the stock. She also testified that on July 25 she paid $1,000 to defendant for 500 shares of Stadia, and several days later she received a certificate for those shares.

Ada Bell, the purchaser referred to in count 7, testified that she is a schoolteacher; she met defendant in 1954, at which time he prepared an income tax return for her; in July, 1955, she and Mrs. Pratt had a conversation with defendant regarding Stadia; on July 25 she paid $3,000 to defendant for 1,500 shares of Stadia, and several days later she received a certificate for those shares. The testimony of Mrs. Bell, regarding the statements of defendant in said conversation, was substantially the same as the testimony of Mrs. Pratt regarding defendant's statements.

Taylor Holmes, the purchaser referred to in count 10, testified that he is an actor; defendant had prepared income tax returns for him; in July, 1955, defendant said that he knew a fine way to make money quickly and he wanted Holmes in on it, that Stadia stock would go on the market on August 23, and would go to $5.00 a share.

Mr. Holmes testified further that on July 23, 1955, he paid $1,000 to defendant for 500 shares of Stadia stock, and several days later he received a certificate for those shares; on August 2, 1955, he paid $3,000 to defendant for 1,500 shares of Stadia, and thereafter he received a certificate for those shares (certificate dated August 19); on September 7, 1955, he paid $600 to defendant for 300 shares of Stadia, and thereafter he received a certificate for those shares (certificate dated September 20). The certificates referred to in the above testimony of Holmes were issued, in Holmes' name, by Stadia.

Dr. Wheelis, a physician, testified that on June 14, 1955, while he and defendant and seven other persons were at a luncheon, defendant said: that Stadia stock was available only through him at that time; he had performed some service for Stadia and could get stock at $2.00 a share; the stock would

be on the market about two weeks later at $5.00 a share; he would buy the stock at $2.00 a share and sell it to Dr. Wheelis and the others who were at the luncheon for $2.00 a share.

Dr. Wheelis testified further that on July 15, 1955, he paid $1,200 to defendant for 600 shares of Stadia stock, and thereafter he received a certificate for those shares; subsequently he purchased additional shares of Stadia stock, through the agency of another man, at $1.00 a share; thereafter he (witness) demanded that defendant return the money which he had paid to defendant for the 600 shares, and a few days later defendant paid him $1,200, and then Dr. Wheelis returned the certificate for the 600 shares to defendant.

The prosecution also introduced evidence, as follows: On July 29, 1955, defendant purchased 17,800 shares of Stadia from Austin B. Smith Brokerage Company in Salt Lake City, and in payment therefor he gave to that company a check for $17,800, which check was dated July 18, 1955 (a date which was 11 days before the purchase). Mr. Smith gave defendant a confirmation of the sale and told him that the stock could be issued in the names of any persons. Defendant gave the secretary the names of 11 persons to whom the stock was to be issued, and he designated the number of shares to be issued to each person. Some of those persons, and the number of shares designated for them, were: George Neikrug 350 shares; Ada Bell 500 shares; Anne Pratt 1,500 shares; Taylor Holmes 500 shares; and defendant, 7,800 shares. On August 15, 1955, defendant purchased 4,700 shares of Stadia from said Smith company, and in payment therefor he gave to that company a check for $4,700, which check was dated July 31, 1955 (a date which was 15 days before the purchase). Defendant gave the secretary of Stadia the names of 13 persons to whom the stock was to be issued, and he designated the number of shares to be issued to each person. Some of those persons, and the number of shares designated for them, were: George Neikrug 200 shares; and defendant or Zona Bell 1,500 shares. On August 20, 1955, defendant purchased 4,000 shares of Stadia from the Smith company, and in payment therefor he gave to that company a check for $4,000, which check was dated August 20, 1955. (The record does not show the names of the persons to whom the stock was issued. Defendant testified that about 2,000 shares were issued in his name, and he believed that he told Smith's secretary the names of one or two persons to whom the stock was to be issued.) On Sep-

tember 3, 1955, defendant purchased 18,200 shares of Stadia from the Smith company, and in payment therefor he gave a check for $18,200, which check was dated August 20, 1955 (a date which was 14 days before the purchase). Defendant gave the secretary of Stadia the names of 14 persons to whom the stock was to be issued, and he designated the number of shares to be issued to each person. Some of those persons, and the number of shares designated for them, were: Samuel Neikrug 2,500 shares; Israel Baker 1,000 shares; George Neikrug 400 shares; Alexander Neiman 100 shares; and defendant 8,050 shares. On September 20, 1955, defendant purchased 1,100 shares of Stadia from the Smith company, and in payment therefor he gave a check for $1,100, which check was dated September 13, 1955 (a date which was 7 days before the purchase). (The record does not show the names of the persons to whom the stock was issued.)

With reference to the above-mentioned purchases from the Smith company, defendant testified in substance the same as is above set forth with reference to those purchases.

Defendant testified further that on July 3, 1955, he met John Collins (then secretary and treasurer of Stadia) in Wyoming, and they had a discussion regarding Stadia; in reply to defendant's inquiry, Collins said that no stock of Stadia was available at that time; about July 8, 1955, Collins (who was then in Reno, Nevada) called defendant by telephone and said that he had come across a block of stock (10,000 shares) in the hands of a Nevada resident, and that 9,850 shares of the stock were available; defendant told Collins that he wanted the stock, that Collins could consider it a closed deal, and that defendant would mail a check to Collins; Collins said, "You're the owner of the stock as of now"; on that same day, defendant mailed his check to Collins, which check was payable to Stadia; at that time he did not have $9,850 in the bank on which the check was drawn, but he had made arrangements to borrow the money from a friend; the following morning, in a telephone conversation, Collins confirmed receipt of the check and said that the stock was defendant's stock and that he (Collins) would transfer the certificate to defendant as soon as possible; on July 16, when defendant was in Reno, he gave another check for $9,850 to Collins, and Collins returned the other check (for $9,850) to defendant; the check he gave to Collins on July 16 (second check) was inadvertently dated July 14, (the check was payable to Collins); subsequently he received Stadia stock certifi-

cate Number 21 for 10,000 shares which had been issued in the name of C. A. Upson; and he also received an assignment of 9,850 shares represented by the certificate, which assignment was signed by C. A. Upson and dated July 20, 1955; a stock certificate for 9,850 shares was not issued in his name; before July 29, 1955 (the date of defendant's first purchase from the Smith company), he had sold about 7,850 shares of the stock represented by the Upson certificate.

Copies of certificate Number 21, and said assignment of 9,850 shares, and the second check for $9,850, which are referred to in defendant's testimony, were received in evidence. The spaces provided in the assignment for the name of the assignee are blank. The date on the second check, July 14, 1955, was a date which was 2 days before the date defendant allegedly gave that check to Collins. The first endorsement stamp of a bank on that check (a bank in Reno) was dated July 21, 1955, which was five days after defendant allegedly gave the check to Collins.

There was evidence, on behalf of defendant, that about July 20, 1955, defendant delivered certificate 21 to Stadia, and requested that the shares represented thereby be transferred to certain persons; that pursuant thereto Stadia issued 13 certificates, in the names of various persons, for a total of 9,850 shares; that about July 23 Stadia delivered those certificates to defendant. Included in those certificates there were certificates as follows: one issued in the name of George Neikrug for 250 shares; one issued in the name of John Pangman for 1,000 shares; and one issued in the name of Stanley Marlowe for 2,100 shares.

A contention of appellant, as above stated, is that he was the owner of the stock which he sold, and as such owner he was exempt from any statutory requirement that a seller of securities should have a license to sell them. He argues that, under the provisions of section 25152 of the Corporations Code, the Corporate Securities Law does not apply to a sale of stock by a bona fide owner of the stock. Said section 25152 provides, in part: "Except as expressly provided in this division," the Corporate Securities Law does not apply to the sale of securities by a bona fide owner of the securities. Section 25700 which is in the same code division provides: "No person or company shall act as an agent or broker until it has . . . secured from the commissioner a certificate . . . authorizing it so to do." Section 25006 which is in the same code division provides: "'Broker' includes every person . . . other

than an agent, who . . . engages either wholly or in part *in the business of selling,* offering for sale, negotiating for the sale of . . . any security issued by others . . . *or of purchasing such securities with the purpose of reselling them,* or of offering them for sale *to the public.*'' (Italics added.) It thus appears that other code provisions, in the same code division where said section 25152 appears, contain an exception to the provision (in section 25152) that the Corporate Securities Law does not apply to a sale by a bona fide owner. Those other provisions were to the effect that no person shall act as a broker until he has secured a license; and a broker is a person who engages *in the business* of selling, or of negotiating for the sale of, securities to the public. ▇▇▇ It is apparent, therefore, that a statutory exception to said provision in section 25152 is that the Corporate Securities Law does apply to sales of securities by an owner of securities who is engaged *in the business* of selling, or of negotiating for the sale of, the securities to the public. The charges herein against the defendant were in substance, as above shown, that he unlawfully engaged in the business of buying and selling and of negotiating for the sale of securities, as defined in said section 25006 of the Corporations Code, without having secured a license so to do. The issue herein, therefore, was whether or not defendant was unlawfully engaged in the business of buying and selling, or of negotiating for the sale of, securities without having a license so to do. ▇▇▇ Mere proof that a seller of securities was the owner of the securities at the time of the sale does not necessarily exempt the seller from said statutory requirement that a person who engages in the business of selling, or of negotiating for the sale of, securities to the public should be licensed so to do.

▇▇▇ The jury could have reasonably found from the evidence that at the time defendant agreed to sell Stadia stock to the various persons, mentioned in the counts on which he was convicted, he was not the owner of the stock he subsequently delivered to them; that after he had agreed to sell stock to those persons, he purchased stock from Collins and the Smith company in order that he might make delivery of the stock he had agreed to sell; and that he was engaged in the business of buying and selling, and of negotiating for the sale of, the stock. It was established that he did not have a license. With respect to the sales to Neikrug, Pangman, and Marlowe (counts 1, 3, and 5) on July 11, 15, and 14, respectively, the jury was not required to believe defendant's ex-

planation to the effect: that about July 8 he told Collins that he would then buy from Collins 9,850 shares of stock; that on that day he mailed a check for $9,850 to Collins; and that Collins then said that defendant was then, at the time of the alleged conversation, owner of those shares. It was conceded by defendant that he did not have sufficient money in the bank to pay the check for $9,850 which he allegedly mailed to Collins on July 8. That check, which he asserted was returned by Collins on July 16, was not produced in evidence. The jury could have found that his first agreement to buy the 9,850 shares from Collins was on July 16, when he gave Collins a check for $9,850, and predated it July 14; and could have found that the purchase from Collins was completed on July 20, when defendant received the assignment of 9,850 shares from Upson. In other words, the jury could have found that it was on July 20, several days after the defendant agreed to sell stock to Neikrug, Pangman, and Marlowe (on July 11, 15, and 14, respectively) that defendant became owner of the stock which Stadia, at his request, delivered to him on July 23.

With respect to the sales to Bell and Pratt (counts 7 and 8) on July 25, and to the sale to Holmes (count 10) on July 23, there was evidence that on July 29 defendant purchased 17,800 shares of Stadia from the Smith company, at $1.00 a share, and on that day he gave his predated check (dated July 18) in payment therefor. It was from those shares that Stadia, on July 29, at the request of defendant, issued certificates of stock to Bell, Pratt, and Holmes for the shares they had purchased from defendant on July 25 and 23. It appears that on July 29, several days after defendant agreed to sell stock to those purchasers (on July 25 and 23), he purchased stock in order that he might make delivery of the stock he had agreed to sell. The jury could have found he was not the owner of the stock when he agreed to sell it to those purchasers; and could have found that he predated his check (July 18) in order to make it appear that he purchased the stock before he agreed to sell it. Even if it be assumed that defendant owned the stock for a brief period preceding the delivery of it to the various purchasers, the jury could reasonably have found that he was engaged in the business of buying and selling, and of negotiating for the sale of, the stock.

■ As above stated, a further contention of appellant is to the effect that he, as owner of the securities involved herein, was exempt, under the due process and equal protection of the law provisions of the federal and state Constitutions, from

a statutory requirement that a seller of securities should have a license in order to sell them. In *People* v. *Woolsey*, 13 Cal. App.2d 54 [56 P.2d 557], the defendant contended that the Corporate Securities Act was unconstitutional insofar as it purported to regulate the sale of securities by him, as owner of the securities. It was held therein that his contention was not sustainable. In that case it was said, at page 57: ''We see no reason to exempt one such as appellant, engaged in the buying and selling of securities as a 'business,' from the necessity of securing a broker's license and submitting to the reasonable regulations of the act. The public welfare is directly involved, the provision complained of is not discriminatory or unreasonable, and the fact that appellant is the owner of the securities bought and sold for the brief interval that they are in his possession presents no cogent reason why the act is inapplicable in his case. To hold otherwise would be to defeat the enforcement of the act and to prevent the safeguarding of the public designed by this legislation.'' The statutory requirement, involved herein, to the effect that a person who engages in the business of buying and selling, or of negotiating for the sale of, securities should have a license so to do, is not unconstitutional as applied to appellant in the matter of his said transactions involving Stadia stock.

■ Appellant also contends (1) that the Corporate Securities Law violates the constitutional right of due process of law in that it is vague and uncertain; and (2) that it violates the constitutional right of free speech in that it confers arbitrary powers on the Commissioner of Corporations. This contention is not sustainable. Similar contentions were made in *People* v. *Sears*, 138 Cal.App.2d 773 [292 P.2d 663]. In that case it was said, at page 793: ''Appellant's claim that the statute is vague and indefinite and for that reason does not state a public offense is untenable. ■ The language of the Corporate Securities Law provides an adequate warning as to what conduct comes within its prohibition.'' It was said further in that case, at pages 791-792: ''In answer to appellant's challenge that the act restrains the right of free speech in violation of the First Amendment to the Constitution of the United States, which is protected by the Fourteenth Amendment against state action, in that it confers plenary and arbitrary powers upon the Commissioner of Corporations, and forbids a person to deal with his property as he chooses, we might quote the following observation of the Supreme Court of the United States relative to the purposes of legislation of this character and of

the evils it is designed to correct: . . .'' (The quotation there referred to is in *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 550 [37 S.Ct. 217, 61 L.Ed. 480].)

■ Appellant contends that the information was insufficient in that it did not apprise him of the charges against him in such a manner as to enable him to prepare his defense and to protect him against another prosecution for the same offense. ■ An information is sufficient if it charges the offense ''in any words sufficient to give the accused notice of the offense of which he is accused.'' (Pen. Code, § 952.)

■ ''Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section 870 (or section 925) of the Penal Code.'' (*People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501].) ■ In substance, each count of the information on which defendant was convicted charged him with selling stock, issued by Stadia, without having obtained a broker's license. This contention is not sustainable.

■ Appellant contends that the court erred in not receiving in evidence certified copies of the pleadings and judgment in a civil action commenced in Utah by five of the complaining witnesses, and others, against Stadia, appellant, John T. Collins, and others, to rescind the purchases of Stadia stock and to recover the amounts paid for the stock. When defendant offered the pleadings in evidence, the prosecution objected to the offer on the ground that the copies were immaterial and that the parties and issues were not the same. The objection was sustained. Appellant argues that the pleadings were admissible to show: interest, bias and motive on the part of some of the prosecution witnesses herein; that allegations of that complaint were inconsistent with the testimony of prosecution witnesses in the present case; and that the issues of ownership of the stock and misrepresentation in the sales of the stock had been adjudicated in that action. During cross-examination of some of the complaining witnesses, defendant's counsel elicited information that the complaining witnesses herein had commenced the Utah action, and elicited information as to the nature of that action. Appellant has not specified the allegations, of that complaint, which he claims are inconsistent with the testimony of prosecution witnesses. The parties to the Utah action, i.e., the prosecution witnesses herein and others, as plaintiffs therein, and appellant and

others, as defendants therein, were not the same as the parties to the present case, i.e., the People of the State of California and the appellant. The court did not err in sustaining the objection.

Appellant contends that the court erred in refusing to instruct the jury, as requested by him, to the effect that testimony by deposition is entitled to the same consideration as testimony by a witness in court. The only witness whose testimony was given by deposition was Austin B. Smith, a witness for the prosecution, who testified regarding the sales of Stadia shares by the Smith company. Appellant argues that the failure to give the requested instruction minimized the value of Smith's testimony that appellant bought and paid for the stock which appellant sold to the complaining witnesses. The prosecution did not contend that appellant did not pay for the stock he bought from the Smith company. The prosecution introduced in evidence: (1) copies of the documents in which the Smith company confirmed the sales of the stock to appellant; and (2) copies of appellant's checks to the Smith company. The court did not err in refusing to give said instruction.

Appellant asserts that the court erred in refusing to give 11 other instructions which were requested by him. In his opening brief he does not set forth those instructions or cite the pages where such instructions are in the record. In that brief he states that each of the instructions touched on the issues raised by the People, and that the instructions "had to do" with "the following facts and law" developed by the prosecution evidence. The "facts and law," so referred to, were briefly set forth by a general reference to the subject matter of the proposed instructions. Those references were as follows: Legality of a "short sale." Presumptions—that private transactions have been fair; the law has been obeyed; ordinary course of business is followed; and a person is owner by exercising acts of ownership. A valid contract may be made by telephone. An owner of stock may make sales without a permit or without having actual possession of a certificate of ownership. Specific intent, when an element of an offense, must be proved. One's right to dispose of his property is guaranteed by the state Constitution.

Appellant's argument with reference to such refused instructions is that by reason of the court's refusal to give those instructions he was denied due process of law. In view of such general references and general argument as to those

252

instructions, it is not necessary to discuss the instructions in detail. As to the presumptions referred to, it appears that the given instruction on the subject of reasonable doubt was adequate. Furthermore, appellant testified with reference to his actions and statements in connection with the transactions. Specific intent is not a necessary element of the offense, charged herein, of violating the Corporate Securities Act. (See *People* v. *Murphy*, 17 Cal.App.2d 575 [62 P.2d 592].) As to the other refused instructions, so referred to, it is sufficient to say that they are covered by instructions which were given. The court did not err in refusing to give said instructions.

 Appellant contends that the judge erred in refusing to discuss with appellant's counsel the instructions submitted by him. The judge was not required to discuss the instructions, and he did not err in refusing to discuss them.

 Appellant contends further that the court erred in instructing the jury, as requested by the prosecution, that the jury should view with caution any evidence that purports to relate an oral admission of the defendant. Appellant argues that there was no evidence of an oral admission by him. Officer Gibbons, an investigator for the district attorney, testified that appellant said that he was selling the stock for $2.00 a share and buying it in Salt Lake City for $1.00 a share; the checks to the Smith company were in payment for Stadia stock; the confirmation slips from the Smith company were receipts showing that the sales had been made; he wrote the names of persons, and the numbers of shares to be issued, on the lists which he gave to the secretary of Stadia. The court did not err in giving the instruction.

 Appellant also contends that it was error to give the following instruction: "The Corporate Securities Law of this state provides that no person shall act as an agent or broker in the sale of, offering for sale, or negotiating for the sale of, or in taking subscriptions for, any security until such person shall have secured from the Commissioner of Corporations of the State of California a certificate authorizing him so to do, and unless that certificate then is in force. A violation of that law is a criminal offense." Appellant argues that this instruction might cause the jury to believe that if a person sells his own stock, without having obtained a permit, he has committed an offense; and it told the jury that the defendant was acting as a broker or agent in selling the Stadia stock. The instruction included some of the provisions of sections 25700, 25006,

and 26104, subdivision (a), of the Corporations Code. As stated in other given instructions, no instruction was to be considered as a single instruction, but all instructions were to be considered together, and each instruction was to be considered in the light of all the other instructions. A given instruction defined the word ''Broker,'' and such definition included a statement to the effect ''Broker'' included a person who engages *in the business* of selling or of negotiating for the sale of securities. The court did not err in giving said above quoted instruction.

Appellant also contends that it was error to give the following instruction: ''Every officer, agent, or employee of any company, and every other person who knowingly authorizes, directs, or aids in the issue or sale of, or who issues or executes or sells or causes or assists in causing to be issued, executed, or sold, any security the issuance, execution, or sale of which has not been authorized by a permit from the Commissioner of Corporations of the State of California then, in effect, is guilty of a public offense. The law which defines this offense is known as the Corporate Securities Law.'' Appellant argues that this instruction told the jury that he directed or aided in the issue or sale of a security, or that he sold a security, without first obtaining a permit; that the instruction deprived the jury of its right to determine questions of fact; that the instruction was incomplete in that it did not include a provision that if the jury found from the evidence that defendant sold his own stock to the complaining witnesses, he was exempt from prosecution; that the instruction was incomplete in that it did not incorporate the language of section 25152 of the Corporations Code; and that the instruction was prejudicial for the reason that it pertains to section 26104 of the Corporations Code, whereas appellant was charged with violation of section 26104, subdivision (a), of that code. That instruction included provisions of section 26104 of the Corporations Code, including provisions of subdivision (a) of that section. It is to be noted that the word ''permit'' (rather than the word ''license'') was used in the instruction. An instruction, given at the request of appellant, stated circumstances under which the Corporate Securities Law was not applicable to an owner. That instruction included the words of said section 25152, except the beginning words of that section which are: ''Except as expressly provided in this division.'' Said instruction was as follows: ''The Corporate Security Law does not apply to the sale of securities

when made by or on behalf of a vendor not the issuer or underwriter thereof who, being a bona fide owner of the securities, disposes of his own property for his own account, and the sale is not made directly or indirectly for the benefit of the issuer or an underwriter of the security, or for the direct or indirect promotion of any scheme or enterprise with the intent of violating or evading any provision of the Corporate Securities Law.'' As hereinabove indicated, the jury was also instructed to the effect a person who engages in the business of selling securities is required to have a broker's license. Also as above stated, there was an instruction to the effect that all the instructions were to be considered together. The defendant was charged with engaging in the business of selling securities without having a license so to do. The use of the word ''permit'' in the instruction, instead of the word ''license,'' was not prejudicial. The court did not err prejudicially in giving said above quoted instruction.

Appellant contends that the deputy district attorney was guilty of prejudicial misconduct in asking appellant, on cross-examination, the following questions: (1) ''And the reason you did that, sir [repurchased the stock appellant sold to Dr. Wheelis], is because you knew that you had swindled Dr. Wheelis, isn't that right?'' (2) ''You knew you had cheated Dr. Wheelis, is that right?'' (3) ''As a matter of accommodation you cheated Mr. Neikrug out of $2,400; is that right?'' (4) ''It [accepting $2,400 from Mr. Neikrug] was like taking candy from a baby, wasn't it?'' Apparently, appellant's objection to those questions related principally to the words ''swindled'' and ''cheated.'' Appellant was charged with the theft of $1,200 from Dr. Wheelis; and with theft of $2,400 from Mr. Neikrug. Those charges were based on alleged fraudulent representations. Preceding the question in which the word ''accommodation'' was used, appellant had said that he accommodated various persons by selling stock to them. The asking of those questions did not constitute misconduct.

Appellant also contends that the deputy district attorney was guilty of misconduct by reason of statements made in his argument to the jury. Some of those statements are as follows: ''Are you going to believe Mr. Morrison who would lie to you to save himself in any respect or would you believe Mr. Gibbons. Now, when you look at that evidence in its proper perspective, you will see, ladies and gentlemen, that this was completely a figment of the defendant's imagination, this conversation. You see all throughout the trial, Coun-

sel had been asking all of these witnesses as to the result of that trial up in Salt Lake City; and throughout the trial the Judge has been excluding that evidence as being immaterial. So now he has his last witness on the stand. This is his last chance to get it in before you as to what that verdict was up there. So he has Mr. Morrison make a portion of the conversation that never happened, because that's the only way you people—— MR. CAPLOW: If the Court please, I object to that slur against Defendant's counsel, your Honor. THE COURT: It's argument, Mr. Caplow. Counsel is entitled to discuss the credibility of the witnesses. The objection is overruled. MR. STOVITZ: I am sorry if I intimated that it was Counsel that did it; because you see sometimes when you do have an advocate working with a particular side, that advocate does join forces and becomes an ally of the defendant or the plaintiff as the case may be. For instance in this case Mr. Morrison made believe that he is being persecuted, and he made believe that all of these actions that these people have taken, trying to recover their just money, as persecution. And so his attorney, his advocate, comes out and tells you those things that are written in the defendant's mind.''

The statements of the deputy were made in commenting on the credibility of appellant and Mr. Gibbons (investigator for the district attorney) with respect to a telephone conversation between them. Appellant had testified that he told Mr. Gibbons that in an action brought in Utah, by the complaining witnesses in the present case, it had been adjudged that he was the owner of the stock, he had not violated the Corporate Securities Act, and he was ''free'' from fraud. Mr. Gibbons had testified that they did not discuss the outcome of the Utah action, and appellant did not say that he had recovered judgment in that action. Prior to that testimony, appellant had on numerous occasions offered in evidence the pleadings and judgment in the Utah action, and objections thereto had been sustained. The deputy in referring to appellant's counsel, in connection with appellant's testimony about the Utah case, was referring to questions, which apparently afforded appellant an opportunity to tell about the Utah case. The statements of the deputy did not constitute misconduct.

Appellant asserts further that the deputy district attorney was guilty of misconduct by reason of a statement made by him during cross-examination of appellant. That statement is the last two sentences of the following quotation: ''Q. [By deputy district attorney] Where is the record to

show that that stock was in your name, Mr. Morrison? Mr. Caplow [attorney for defendant] : That's objected to. Counsel knows where the records are. They're up in Salt Lake City. Mr. Stovitz [deputy] : I know that not to be a fact, Mr. Caplow. I know that there are no records to show that 17,800 shares of stock was in this witness' name.'' It thus appears that the exchange of comments between the attorneys, regarding the location of the records, was initiated by counsel for appellant. He charged that the deputy knew where the records were, and then he declared that they were in Salt Lake City. Thereupon, the deputy denied the charge, and then asserted his view regarding the records. Under such circumstances, the statements of the deputy did not constitute misconduct.

Other contentions of appellant that the deputy was guilty of misconduct do not merit discussion. The deputy was not guilty of misconduct.

Appellant contends that the trial judge was guilty of misconduct in that (1) he overruled several objections of appellant to evidence offered by the prosecution; (2) he erred in instructing the jury; and (3) he made statements in the presence of the jury which prevented appellant from having a fair trial. He has not referred specifically to any such alleged statement of the judge. This contention is wholly without merit.

The judgment and the order denying the motion for a new trial are affirmed.

Vallée, J., concurred.

Shinn, P. J., concurred in the judgment.

A petition for a rehearing was denied March 17, 1959, and appellant's petition for a hearing by the Supreme Court was denied April 22, 1959.