[No. C006193. Third Dist. Apr. 30, 1980.]

THE PEOPLE ex rel. CHRISTINE BENDER, as Commisioner of Corporations, etc., Plaintiff and Appellant, v.
WIND RIVER MINING PROJECT et al., Defendants and Respondents.

COUNSEL

G. W. McDonald, William R. Bickford, Joan E. Kerst and Marguerita Fa-Kaji for Plaintiff and Appellant.

Jack A. Whitley II, in pro. per., Van Camp & Johnson and James O. Moses for Defendants and Respondents.

OPINION

**SPARKS, J.**—In this case we are called upon to determine whether certain gold production and delivery agreements constitute securities within the meaning of the Corporate Securities Law of 1968. (Corp. Code, § 25000 et seq. [unless otherwise noted further section references are to the Corporations Code].) The plaintiff Commissioner of Corporations (Commissioner) commenced a civil action against numerous defendants alleging violations of the Corporate Securities Law. The defendants are various parties involved in offering for sale to the public certain gold production and gold delivery agreements without registering them as securities, and according to the complaint, by means of misrepresentations. The Commissioner sought to enjoin the sale and offering of these agreements and to obtain other relief. The trial court entered a judgment dismissing the action as to certain defendants after it sustained without leave to amend their demurrer to the

Commissioner's first amended complaint.[1] The sole basis for the court's decision was its conclusion that the gold production and gold delivery agreements offered for sale by defendants are not securities within the meaning of the Corporate Securities Law. We hold that under the facts alleged in the first amended complaint, which we must accept as true for purposes of this appeal, defendants' gold production and gold delivery agreements are securities within the meaning of our Corporate Securities Law. Accordingly, we shall reverse the judgment of dismissal and remand for further proceedings.

### Factual and Procedural Background

Before addressing the facts alleged in the complaint, it is appropriate that we make a few preliminary observations. First, we agree with defendants that we are not here concerned with determining whether their scheme constitutes some form of common law fraud or other defalcation. The Commissioner has jurisdiction over securities and has brought this action pursuant to her authority over the regulation of securities. (§ 25530 et seq.; Gov. Code, § 11180.) If defendants' gold production and gold delivery agreements are not securities, then they are entitled to prevail. On the other hand, it is not asserted that the first amended complaint is otherwise deficient. Thus, if the Commissioner has alleged sufficient facts to support the claim that the gold production and gold delivery agreements are securities, then the judgment must be reversed so that she may proceed with this action.

Second, we reject defendants' claim that the Commissioner is bound by the written terms of the gold production and gold delivery agreements. ■ It is well established that in determining whether a transaction constitutes a security, courts must consider the facts and circumstances surrounding the transaction in light of the purpose of the Corporate Securities Law. (*Moreland* v. *Department of Corporations* (1987) 194 Cal.App.3d 506, 512 [239 Cal.Rptr. 558].) Thus, we "look through form to substance." (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135].) And we are not bound by the understanding of the parties on the question of whether their transaction constitutes a security. "The understanding or misunderstanding of the parties as to the nature of the transaction is not determinative of its legal effect. However innocent in one sense may have been the defendants' intentions,

---

[1] Those dismissed defendants, Wind River Mining Project, Youngquist Mine Development and Consultation, Inc., Theodore N. Youngquist, Lillie Youngquist, John J. Combis, Jack A. Whitley II, and Thomas W. Kill, Jr., doing business as Ramco Investments, are the respondents in this appeal.

their acts in entering into the contract were deliberate and it is by their acts and the language of the Corporate Securities Act that we must judge the legal consequences of those acts . . . ." (*People* v. *Sidwell* (1945) 27 Cal.2d 121, 126 [162 P.2d 913].)

Finally, we reject defendant Whitley's assertion that we must apply a substantial evidence review in this case. This assertion is based upon the fact that earlier in the action the trial court denied a request for a temporary restraining order after reviewing various pleadings and documentary evidence. Whitley asserts that this ruling became res judicata and compelled the court to sustain the subsequent demurrer and that accordingly our review on appeal should be confined to substantial evidence review of the court's determination on the motion for a temporary restraining order.

However, a request for temporary equitable relief pending the determination of a case on its merits is an entreaty to the court to exercise its discretion and a ruling thereon is not a determination of the merits of the case. (*People* v. *Black's Food Store* (1940) 16 Cal.2d 59, 61-62 [105 P.2d 361].) Such a pretrial ruling may not be given issue-preclusive effect with respect to the merits of the action. (*Service Employees International Union* v. *Hollywood Park, Inc.* (1983) 149 Cal.App.3d 745, 756 [197 Cal.Rptr. 316]; *Rebco Development, Inc.* v. *Superior Court* (1977) 67 Cal.App.3d 13, 16-17 [136 Cal.Rptr. 351]; *Tiffany Productions, Inc.* v. *Superior Ct.* (1933) 131 Cal.App. 729, 734 [22 P.2d 275].)

A general demurrer admits the truth of all material factual allegations in the complaint. (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].) Consequently, on appeal from a judgment of dismissal entered following an order sustaining a demurrer we must accept as true all properly pleaded facts in the complaint. (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 827-828 [134 Cal.Rptr. 839].) The question is whether the facts pleaded are sufficient to show a cause of action. (*Rader Co.* v. *Stone* (1986) 178 Cal.App.3d 10, 20 [223 Cal.Rptr. 806].) On this question we are not bound by the trial court's determination but must exercise our own independent judgment. (*Ibid.*) In this appeal the sole question is whether the facts alleged in the complaint are sufficient to support the claim of the Commissioner that defendants are selling or offering to sell securities within the meaning of the Corporate Securities Law of 1968. With these observations in mind we will turn to the allegations of the first amended complaint.

Defendant Wind River Mining Project (Wind River) is a limited partnership. Defendant Youngquist Mine Development and Consultation, Inc. (the

Youngquist corporation), is a general partner in Wind River.[2] Wind River and the Youngquist corporation acquired an interest in mineral claims in Skamania County, Washington, which we may refer to as the Wind River claim. The Wind River claim is alleged to contain gold-bearing ore. However, any gold in the Wind River ore is associated with sulfide minerals so that extraction is not commercially feasible by standard gravitational methods but requires the use of cyanide or other dangerous materials. Wind River and the Youngquist corporation do not have and will not be able to obtain the necessary governmental permits to use such chemicals on or near the Wind River claim. There is no mill properly equipped to treat the Wind River ore within reasonable proximity to the claim. Wind River and the Youngquist corporation will be required and they propose to develop and construct a unique, experimental and untested gravitational mill to process and extract gold from the Wind River ore.

Wind River and the Youngquist corporation need "start up" capital to construct such a specialized mill, to finance further development and exploration of the Wind River claim, to mine ore, and to provide funds for operations. To obtain this start-up capital they have solicited investments from the general public by offering certificates which are described as "production agreements" or "gold delivery agreements."

Defendants' "Production Agreement" is in the form of a certificate issued by Wind River. It recites that Wind River has ore located underground in the State of Washington and that the investor, referred to as the buyer, wishes to purchase immediately a certain number of ounces of gold from Wind River. Wind River agrees to deliver the ounces of gold 15 months after execution of the agreement, and the buyer agrees to pay $225 per ounce of gold upon signing the agreement. The gold is to be in the form of .995-fine hallmarked ingots or bars. Wind River agrees that if the spot price of gold should fall below $225 per ounce at the time of delivery, then it will pay to the buyer the difference between the prepayment price and the spot price. The certificate also provides: "If the completion of the development work by the *Seller* should be delayed for any cause beyond the control of the *Seller* including but not limited to, fire, storm, flood, earthquake, explosion, accidents, acts of the public enemy, or sabotage, strikes, labor dis-

---

[2] The complaint also alleges that North Wind Enterprises, Ltd., whose president is Edward Mazur, is a general partner in Wind River. Other allegations, including Mazur's convictions for grand theft, are alleged. In his brief respondent Whitley asks that we take judicial notice of a judgment of the Los Angeles County Superior Court, entered after the demurrer was sustained in this case, which holds that neither North Wind nor Mazur has any interest in the Wind River partnership or mining claims. North Wind and Mazur are not parties to this appeal, and the allegations of the complaint concerning them are irrelevant to the conclusion we reach here. Accordingly, we decline the request for judicial notice.

putes, labor shortages, work stoppages, transportation embargoes or delays, funding commitment delays, failure or shortages of material or machinery used by the *Seller,* acts of God, acts or regulations of the federal, state or local government or branches or agencies thereof, then the time of completion mentioned in this *Agreement* shall be extended for a period equivalent to the time lost by reason of any or all such causes." (Italics in the original.)

Defendants' "Gold Delivery Agreement" is in the form of a certificate issued by the Youngquist corporation. It is generally similar to the Wind River production agreement, except that the price of gold is set at $285 per ounce. The delay clause is more abbreviated in the gold delivery agreement. It reads: "If Seller's mining operation at Wind River should be delayed for any cause beyond its control, such as deemed Acts of God or government, then the time mentioned in paragraph 2 above shall be extended for a period equivalent to the time delayed by such cause."

These Wind River agreements have been sold and are being offered for sale in numerous states through a network of telemarketing firms by means of newspaper and other published advertisements and by high-pressure, boiler-room type telephone solicitations directed to the general public. Defendants have paid to some or all telemarketing firms commissions of as much as 65 percent of the purchase price of the agreements. The Commissioner alleges that defendants have made numerous express or implied misrepresentations in marketing the agreements.

Although the complaint contains a number of other factual allegations, we find further factual recitation unnecessary. As we shall explain, the allegations set forth here are sufficient to bring defendants' scheme within the Corporate Securities Law of 1968 and thus the judgment of dismissal must be reversed.

## Discussion

Virtually all states and the federal government have found it necessary to enact legislation to regulate the sale and issuance of corporate securities. "Among the particular abuses leading to this legislation were the fraudulent promotion and sale of the stock of unsound or highly speculative enterprises having only a remote chance of success, the charging of exorbitant commissions in cash or kind or both by promoters and underwriters for their services in selling securities to the public, the dishonest practices of many brokers, dealers, and salesmen, and the conscious exploitation of the ignorance of many investors on matters affecting the worth of a security. Another and equally important consideration was the legislative conclusion that

the available remedies, primarily the common law or general statutory provisions dealing with fraud and related matters, were inadequate as being directed in the main toward the punishment and not the prevention of the abuse." (14 Fletcher Cyclopedia Corporations (1987 rev.) § 6734, pp. 156-157.)

The first comprehensive state legislation was enacted in Kansas in 1911. It quickly became known as "The Blue Sky Law" since its purpose was to prevent the promoters of corporate securities from selling "the blue sky" to investors, or at least promising it to them. (14 Fletcher Cyclopedia Corporations, supra, § 6734, pp. 156-157; see Lattin on Corporations (2d ed. 1971) § 44, pp. 137-138.) The acts of various states aimed at regulating the sale of securities are now generically called blue sky laws. (*Ibid.*)

California's blue sky law is contained in the Corporate Securities Law of 1968. (Corp. Code, § 25000 et seq.) Corporations Code section 25110 provides in relevant part that "[i]t is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified . . . or unless such security or transaction is exempted . . . ." As defined in section 25019, the term "security" is employed in the broadest possible sense and includes within its ambit any "investment contract" or any "evidence of indebtedness."[3] As the Commissioner correctly notes, these descriptive phrases have been included in the definition of a security in blue sky statutes to regulate novel, uncommon or irregular devices offered as investment opportunities. (See, e.g., *S. E. C.* v. *Joiner Leasing Corp.* (1943) 320 U.S. 344, 351 [88 L.Ed. 88, 93, 64 S.Ct. 120].) ■ "Under widely accepted judicial interpretation and definition, an investment contract for the purposes of securities laws means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third

---

[3] Section 25019 provides, in relevant part: " 'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof); or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document. . . ."

party." (*People* v. *Park* (1978) 87 Cal.App.3d 550, 563 [151 Cal.Rptr. 146]; accord *People* v. *Coster* (1984) 151 Cal.App.3d 1188, 1193 [199 Cal.Rptr. 253].) But it is not enough for an instrument to fall within the literal meaning of the sweeping terms of the definitional statute. Thus, for example, by definition a security includes a "note" and any "evidence of indebtedness." (§ 25019.) Despite their inclusion in the statutory definition, not every note or evidence of indebtedness constitutes a security under the Corporate Securities Law of 1968. As the high court observed in *People* v. *Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680], "[t]he California decisions involving instruments designated as 'notes' are consistent with this principle. Over 40 years ago, in *People* v. *Davenport* (1939) 13 Cal.2d 681 [91 P.2d 892], this court observed that 'it plainly was not the legislative intent that *"every"* note or evidence of indebtedness, regardless of its nature and of the circumstances surrounding its execution, should be considered as included within the meaning and purpose of the act.' " (*Id.* at p. 735, italics in original.) Consequently, "because the definition of security includes such nebulous terms as 'investment contract,' 'certificate of interest or participation in any profit-sharing agreement,' and 'any interest or investment commonly known as a security,' the circumstances of a transaction must be analyzed to determine whether a 'security' is present." (Introduction to Cal. Corporate Securities Practice, Program Material (Cont.Ed.Bar 1988) Security, § 5, p. 31.) As the *Figueroa* court explained, "[t]he list of instruments which come within the statutory definition of a 'security' . . . is an expansive one. However, the cases have adhered to the principle that substance governs over form. '[A] literal interpretation [of the statute] has been uniformly eschewed when to do so would appear to exceed any legitimate legislative purpose.' [¶] Thus, the 'critical question' the courts have sought to resolve in these cases is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition." (41 Cal.3d at pp. 734-735, citations omitted.)

It has been suggested that California courts apply two separate and distinct tests in determining whether a given investment constitutes a security within the meaning of the Corporate Securities Law of 1968. (See *Moreland* v. *Department of Corporations, supra*, 194 Cal.App.3d at p. 513.) These broad tests are designed to give guidance in determining whether a challenged transaction falls within the meaning of the term "security" as used in our Blue Sky Law. Experience has shown, as the scores of published appellate opinions can attest, that some promoters will inevitably evoke promotional schemes intended to evade regulation under the law. ■ The purpose of this statutory scheme, the high court emphasized in *Silver Hills Country Club* v. *Sobieski, supra*, 55 Cal.2d at pages 814 and 816, is to

protect the public against spurious schemes, however ingeniously devised, to attract risk capital, and that goal cannot be permitted to be vitiated by inventive substitutes for conventional means of attracting risk capital. Consequently, as we have noted, in determining whether a transaction is a security courts must consider substance rather than form. (*Ibid.*) The determination must be made on a case-by-case basis after consideration of all of the surrounding facts and circumstances and with attention to the regulatory purpose of the Corporate Securities Law. (*Moreland* v. *Department of Corporations, supra,* 194 Cal.App.3d at p. 512.)

The two general tests often applied by California courts are the federal or *Howey* test formulated under federal law in *S. E. C.* v. *Howey Co.* (1946) 328 U.S. 293 [90 L.Ed. 1244, 66 S.Ct. 1100, 163 A.L.R. 1043], and the "risk capital" test applied by the state Supreme Court in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811. The Commissioner contends that defendants' Wind River agreements constitute investment contracts under the *Howey* and *Silver Hills* tests. She further contends that these agreements are securities in the form of evidences of indebtedness. Defendants, not unexpectedly, argue that the agreements do not constitute securities at all. In this case we need look no further than the decision of our Supreme Court in the *Silver Hills* case to determine that under the facts alleged, defendants' production agreements and gold delivery agreements are indeed securities within the meaning of the Corporate Security Law of 1968.[4]

*Silver Hills* involved partners in a venture to organize a country club and to operate it for a profit. The partners entered into a contract to purchase land which called for installment payments. They made some improvements to the land and intended to make others. They financed the development of the club by selling memberships. The purchase of a membership did not give the member any rights in the income or assets of the club, but did entitle the member and his immediate family to use the club facilities. A member could be expelled only for misbehavior or the failure to pay monthly dues. A membership was transferable provided the board of directors of the club approved the transferee. When a dispute arose over the question whether the memberships were securities, the Supreme Court held that the crucial question was whether the sale of memberships came within the regulatory purpose of the Corporate Securities Act. (55 Cal.2d at p. 814.)

---

[4] The *Howey* test is "whether the scheme involves an investment of money in common enterprise with profits to come solely from the efforts of others." (328 U.S. at p. 301 [90 L.Ed. at p. 1251].) Decisional law has provided judicial gloss to the meaning of these terms. (*Moreland* v. *Department of Corporations, supra,* 194 Cal.App.3d at p. 513.) Since we conclude that *Silver Hills* is controlling, we need not wade into the morass of federal law.

The court found the memberships to be securities. Its reasoning (at pp. 814-816) is instructive and may be quoted here (with citations omitted): "It has been held that a contract providing only for the sale of services is not within the scope and purposes of the act. In other states it has also been held that the sale of memberships in an organization in which members have no interest in the assets or profits is not a sale of securities. In contrast, 'as a general rule, the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.'

"We have here nothing like the ordinary sale of a right to use existing facilities. Petitioners are soliciting the risk capital with which to develop a business for profit. The purchaser's risk is not lessened merely because the interest he purchases is labelled a membership. Only because he risks his capital along with other purchasers can there be any chance that the benefits of club membership will materialize.

"It bears noting that the act extends even to transactions where capital is placed without expectation of any material benefits. . . . Since the act does not make profit to the supplier of capital the test of what is a security, it seems all the more clear that its objective is to afford those who risk their capital at least a fair chance of realizing their objectives in legitimate ventures whether or not they expect a return on their capital in one form or another. Hence the act is as clearly applicable to the sale of promotional memberships in the present case as it would be had the purchasers expected their return in some such familiar form as dividends. Properly so, for otherwise it could too easily be vitiated by inventive substitutes for conventional means of raising risk capital."

 Defendants' Wind River financing scheme falls squarely within the holding in *Silver Hills*. Defendants are engaged in a difficult and speculative mining operation. They wish to finance their enterprise with other people's money and to that end have turned to random solicitation from the general public. The members of the public who subscribe to the gold certificate offering will have no part in the operation or management of the mining and refining operations. And the subscribers' money is at risk since whether they will realize their objective, the receipt of gold, will be entirely dependent upon the success of defendants' business venture. The sale of the Wind River gold certificates to raise risk capital is precisely the type of transaction

the Corporate Securities Law of 1968 was intended to regulate and the gold certificates are paradigmatic examples of securities.

Defendants insist that their gold certificates are not securities because a purchaser will realize a profit only when he sells his gold, and the profit realized will depend upon the purchaser's own actions and the fluctuating price of gold. Defendants have chosen to emphasize the wrong element of the transaction. As the *Silver Hills* decision makes clear, profit to the supplier of capital is not the test of what is a security. The proper test is whether the subscriber's capital outlay is at risk in the sense that realization of the subscriber's objective, whatever that may be, is dependent upon the successful conduct of the business with capital raised through the sales or subscription. (55 Cal.2d at p. 815.) The objective of a purchaser of a Wind River gold certificate is to receive gold at some time in the future.[5] Whether that objective will be realized is entirely dependent upon defendants' successful use of the capital raised through the sale of the certificates, which are thus securities.

Defendants assert that gold is highly saleable on an active market, and that accordingly their gold certificates are simply "the naked sale of tangible personal property." Since the courts look through form to substance, what is in substance the sale of securities cannot be masked through the artifice of putting it in the form of a sale of property. (*Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547, 555-556 [51 P.2d 73]; *Hollywood State Bk.* v. *Wilde* (1945) 70 Cal.App.2d 103, 107 [160 P.2d 846].) What defendants overlook is the fact that they currently have no tangible gold to sell. Gold ore deposits within the ground are part of the real property in which they exist. (See generally 54 Am.Jur.2d, Mines and Minerals, § 105, p. 284.) What defendants have by virtue of the Wind River mining claim is the right to explore for, extract, and refine, and thus reduce to personalty, such gold as may underlie the Wind River claims. (See *Callahan* v. *Martin* (1935) 3 Cal.2d 110, 120 [43 P.2d 788, 101 A.L.R. 871].) In their gold certificates defendants have agreed to deliver, at some future time, .995-fine Wind River gold ingots and/or bars, in return for immediate payment of capital. But all they currently have is a right and a hope; they have no Wind River gold ingots and/or bars to sell. Whether they will ever have refined Wind River gold to provide to investors will depend upon their use of the risk capital raised through selling gold certificates. Such a situation is identical

[5] In fact, the contracts specify a term of 15 months for delivery of the gold. However, they also contain broad escape clauses which essentially extend the period for delivery to whatever time period it takes for defendants to operate their mine and mill successfully. In any event, even if the gold certificates contained an absolute promise of delivery within 15 months, it is clear that delivery is dependent upon the success of the enterprise.

in all important respects to that in *Silver Hills*, where the court placed emphasis on the fact that the memberships at issue were for the use of facilities to be built rather than facilities already existing. (55 Cal.2d at p. 815.)

Defendants maintain that this case is directly controlled by the decision of the Fifth Appellate District Court of Appeal in *Moreland* v. *Department of Corporations, supra,* 194 Cal.App.3d 506. The Commissioner asserts that *Moreland* is factually distinguishable and in any event should not be followed. Because we find that the circumstances in *Moreland* differ in crucial respects from the circumstances in this case, we conclude that it is not controlling authority.

In *Moreland*, the seller owned a mine and surrounding property. It had previously mined, extracted, and stockpiled gold-bearing ore on its property. (194 Cal.App.3d at p. 510.) The already mined and stockpiled ore had a certified assay of .15 ounces of gold per ton, and it appeared probable that the ore contained greater amounts of gold and other precious metals. (*Id.* at p. 515.) The seller offered the stockpiled raw ore for sale at a price of $37.50 per ton, which would work out to $250 per ounce of gold at the assayed rate. (*Id.* at pp. 510, 515.) The ore was available for immediate delivery and purchasers had the unqualified right to remove it and deal with it as they chose. (*Ibid.*) Alternatively, they could enter into an optional refining contract with the seller. Pursuant to the second agreement, the seller would undertake to refine the gold ore and deliver the refined gold at the assayed rate to the buyer. (*Id.* at p. 510.) The seller would retain for itself any gold or other precious metals recovered in excess of the assayed rate or, alternatively, would be required to make up any amount less than the assayed rate which was recovered. (*Id.* at p. 516.) By a final agreement the seller agreed to guarantee performance of the prior agreements. (*Id.* at p. 511.) Under these circumstances the appellate court found that the scheme did not involve the sale of securities.

There are certain crucial distinctions between *Moreland* and the present case. In *Moreland,* the seller had mined for, extracted and stockpiled sufficient gold-bearing ore to fulfill all of the contracts to be sold. The minimum gold content of the ore was known through a certified assay. The gold ore was available for immediate delivery if a purchaser chose to take delivery. A purchaser was not required to, but could, enter into a refining agreement. However, the reviewing court noted that there was nothing to suggest that the refining techniques to be used were unique or experimental so as to introduce a speculative element into the processing itself. (194 Cal.App.3d at p. 516.) In contrast, the defendants in this case are not offering gold ore for immediate sale, and they have not already mined,

extracted and refined the gold which they are offering for sale. The refining process they will be required to develop is experimental. Thus, whether they can successfully develop their enterprise in order to be able to fulfill their gold agreements is speculative. It is dependent upon defendants' successful use of the capital they raise through sale of their gold certificates to develop their enterprise.

Similar distinctions were crucial to the decision in *Silver Hills*. There the high court noted that a contract providing for the sale of services is not within the scope and purpose of the Corporate Securities Law. (*Silver Hills, supra*, 55 Cal.2d at p. 814.) Likewise the sale of memberships in an organization in which the members have no interest in assets or profits is not a sale of securities. (*Id.* at p. 815.) But the court went on to state: "We have here nothing like the ordinary sale of a right to use existing facilities." (*Ibid.*) The developers were soliciting risk capital to develop their business and the potential benefits could have a chance of materializing only because a purchaser risks his capital along with others. (*Ibid.*) Similarly here, and unlike the purchasers in *Moreland,* we have nothing like the sale of existing gold, gold ore stocks, or services. The purchasers of defendants' gold certificates are risking their capital in the hopes of acquiring low-priced gold. The realization of that expectation is dependent upon the risk undertaken and defendants' successful management and development of the enterprise with the capital thus raised.

The court in *Moreland* found it important that the purchasers of ore were purchasing existing supplies of stockpiled ore with a certified assay. This had two effects. First, should the purchaser so choose, he could take immediate delivery of his ore and make his own arrangements for processing. Second, if he chose to permit the seller to process the ore and the seller for some reason failed to do so, the purchaser could nevertheless take his ore elsewhere for processing, and there was nothing to suggest that he could not hope to recover all or a very substantial part of his investment by doing so. These factors differentiated the scheme from the placement of risk capital with the seller. (*Moreland, supra,* 194 Cal.App.3d at p. 523. See also *Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 333-336 [112 Cal.Rptr. 387] [holding that the immediate sale of diamonds at market value was not the sale of securities even though the seller agreed to repurchase the diamonds with a 5 percent per annum profit at any time within 3 years].) Unlike the *Moreland* investors, here the purchasers of gold certificates have nothing, and will have nothing to show for their investment unless defendants succeed in developing their business. In short, purchasers of defendants' gold certificates are investing risk capital in the hope of obtaining a future return on their investment. It does not make any

difference that the expected return is in the form of a specified amount of gold rather than some share of the potential profit. (*Silver Hills, supra,* 55 Cal.2d at pp. 815-816.)

■ Defendant Whitley contends that state regulation of the Wind River scheme is preempted by the federal Commodity Exchange Act. (7 U.S.C. § 1 et seq.) In *Hofmayer* v. *Dean Witter & Co., Inc.* (N.D.Cal. 1978) 459 F.Supp. 733, at pages 736 and 737, the federal district court held that regulation of transactions under state securities laws is preempted by the federal Commodity Exchange Act to the extent such transactions are covered by the federal act. However, state regulation of securities transactions is not superseded or preempted with respect to transactions which are not governed by the federal act. (See 7 U.S.C. § 16(e).) The parties all agree that the Wind River scheme is not regulated under the federal Commodity Exchange Act, and thus in conformity with *Hofmayer* we find no preemption.

Defendant Whitley points to three potential sources of regulation of the Wind River gold certificates as commodity transactions. First is the federal Commodity Exchange Act, which he agrees does not govern this investment scheme. Second is California's former Commodity Advisers Law, formerly Corporations Code section 29500 et seq., which was enacted in 1969 and repealed in favor of federal regulation in 1979. (Stats. 1969, ch. 1305, § 1, p. 2630 et seq.; Stats. 1979, ch. 452, § 2, p. 1596.) Third is the Model State Commodity Code proposed by the North American Securities Administrators Association, Inc., which was adopted in some states but not in California. From this Whitley argues for a form of reverse preemption. He asserts that since the state and federal governments might have, but did not, regulate this scheme through commodities laws, we should not extend securities legislation to cover it. We reject this contention. Our Corporate Securities Law was designed broadly to regulate all transactions by which promoters go to the public for risk capital. (*Silver Hills, supra,* 55 Cal.2d at p. 814; *People* v. *Walberg* (1968) 263 Cal.App.2d 286, 294 [69 Cal.Rptr. 457].) In short, "the purposes of Corporate Securities Law regulation are implicated whenever investors provide capital which will be risked in the promoter's venture or enterprise." (*People* v. *Graham* (1985) 163 Cal.App.3d 1159, 1167 [210 Cal.Rptr. 318].) We will not judicially exclude a scheme to raise risk capital from securities regulation simply because it might have been but is not regulated under some other regulatory scheme.

Whitley notes that among the examples of a security in Corporations Code section 25019 is a "certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title

or lease; . . ." Whitley asserts that this provision does not apply to the Wind River certificates because they are not a part of the Wind River title or lease and because they promise payment of a specific amount of gold rather than a percentage of production. He argues that this specific reference to mining titles or leases must be considered the exclusive test of whether a scheme involving a mine falls within the Corporate Securities Law. We are unpersuaded. The quoted portion of section 25019 is not expressly limited to agreements for percentage payments out of production of a mining title or interest, nor, for that matter, to cash payments. The courts have made it clear that a scheme to raise risk capital will be considered the sale of securities regardless of whether the investor expects a proprietary interest or share of profits or a return on his capital in some other form. (*Silver Hills, supra*, 55 Cal.2d at p. 815; *Walberg, supra*, 263 Cal.App.2d at pp. 293-294.) Defendants' Wind River gold certificates are certificates for payment, in gold, out of production from the Wind River Mine and as such would fall within the quoted language.

Whitley finally contends that to construe the Corporate Securities Law to encompass the Wind River gold certificates would violate principles of due process by failing to give defendants advance warning that their conduct is within the regulatory provisions of the law. This identical contention has been rejected numerous times before. (*People v. Rankin* (1959) 169 Cal.App.2d 150, 158-159 [337 P.2d 182]; *People v. Morrison* (1959) 168 Cal.App.2d 235, 249 [335 P.2d 1022]; *People v. Sears* (1956) 138 Cal.App.2d 773, 793 [292 P.2d 663].) We reject it here for the same reasons.

In summary, defendants are engaged in attempting to develop and operate a gold mining and refining enterprise and in order to finance their enterprise have sought capital from the general public through the sale of gold production or gold delivery certificates. Purchasers of the certificates have no participation in the management and development of the enterprise and must depend upon defendants' efforts for realization of their objectives. This means that in substance the defendants are engaged in raising risk capital and are therefore within the regulatory provisions of the Corporate Securities Law of 1968. Their efforts to avoid regulation through phrasing the agreements as the sale of gold for future delivery, and by promising a specific amount of gold rather than a percentage of production or a share of profits, cannot change the basic nature of their fundraising scheme. Accordingly, we hold that under the facts alleged in the first amended complaint defendants' gold production and gold delivery agreements are securities governed by the Corporate Securities Law of 1968 and that the trial court erred in sustaining defendants' demurrer.

### DISPOSITION

The judgment of dismissal is reversed and the matter is remanded to the trial court with directions to vacate its order sustaining the demurrer to the first amended complaint and to enter a new order overruling the demurrer. Appellant shall recover its costs in this appeal.

Blease, Acting P. J., and Carr, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 18, 1990.