[No. G036509. Fourth Dist., Div. Three. Oct. 27, 2006.]

RONALD EDWARD REISWIG et al., Plaintiffs and Respondents, v. DEPARTMENT OF CORPORATIONS et al., Defendants and Appellants.

COUNSEL

Mark T. Uyeda and Kirk E. Wallace for Defendants and Appellants.

Baker Law Group and John H. Baker for Plaintiffs and Respondents.

OPINION

**FYBEL, J.—**

INTRODUCTION

This case presents a single issue: Whether the investment offered by Fidelity Insured Deposits, Inc. (Fidelity), constitutes a security under California law, subject to the regulatory jurisdiction of the California Department of Corporations (DOC). We conclude the investment was not a security and affirm.

Fidelity offered prospective investors yields on certificates of deposit (CD's) greater than was available at any bank. Prospective customers were required to make an appointment and personally meet with a Fidelity sales agent. The sales agent would inform the prospective customer the higher yield was available only on the first $5,000 invested; if the customer wished to invest more, the sales agent would offer a fixed annuity as an alternative to a CD. If the customer wanted the CD, the sales agent would provide the customer a list of banking institutions offering the highest rates on Federal

Deposit Insurance Corporation (FDIC) insured CD's. Upon proof the customer opened a CD from an institution on the list, Fidelity would cut and send the customer a bonus check equal to the difference between the yield paid by the banking institution and the yield advertised by Fidelity. The check would be issued within seven days of the date on which the customer submitted proof to Fidelity of opening the CD.

The superior court concluded the investment offered by Fidelity was not a security and issued a writ of administrative mandamus ordering the California Corporations Commissioner (the Commissioner) to set aside a desist and refrain order against Fidelity and the other respondents.[1]

We agree with the superior court and hold the CD-plus-bonus package offered by Fidelity is not a security within the meaning of the California securities laws. In so holding, we are not addressing the propriety of Fidelity's promotional scheme. It appears to us Fidelity possibly engaged in a classic bait and switch, using high-rate CD's as bait to lure customers in to hear a sales pitch for annuities, which are subject to regulation by the California Department of Insurance. However, the only issue before us is whether the investment offered by Fidelity is a security and, hence, subject to the DOC's regulatory powers.

FACTS

The facts are substantially undisputed. They are taken from the administrative law judge's proposed decision, which was adopted by the Commissioner.

Ronald Edward Reiswig is the owner and chief executive officer of FEP, Inc. (FEP), which is licensed by the Department of Insurance and operates under the name Family Estate Insurance Services. FEP's only business is selling annuities, a form of insurance. FEP's only source of income is commissions earned from the sale of those annuities.

Janet Sue Reiswig is the owner and president of Fidelity and is Ronald Reiswig's wife. Fidelity's sole purpose is to generate business for FEP. Fidelity is not licensed by the Department of Insurance, or any other regulatory body, and is not FDIC insured. Fidelity has no income but does incur advertising and payroll expenses.

Rick Andrew Leon and Donald Anthony Fracchia each were licensed by the Department of Insurance as life agents and were authorized to transact insurance business on FEP's behalf in Fidelity's offices.

---

[1] The desist and refrain order was issued against Ronald Edward Reiswig; Janet Sue Reiswig; FEP, Inc.; Fidelity; Rick Andrew Leon; and Donald Anthony Fracchia. They petitioned the superior court for an administrative writ of mandate challenging the desist and refrain order. All but Fracchia have appeared in this appeal as respondents.

To attract prospective customers, Fidelity advertised the availability of CD's with a higher yield than was available at any bank. A person responding to the advertisement was required to make an appointment and meet in person with a Fidelity sales agent. The sales agent would inform the prospective customer the advertised CD yield was limited to a $5,000 investment. If the prospective customer had more than $5,000 to invest (which was usually the case), then the Fidelity agent would ask if the customer were interested in realizing greater rates of return than offered by the CD. If the prospective customer answered yes, then the Fidelity agent would give a rehearsed sales presentation promoting annuities offered by FEP.

If the prospective customer decided to buy the CD, the sales agent would provide the customer a list of banking institutions offering the highest rates on FDIC-insured CD's. Janet Reiswig prepared this list daily after conducting Internet research to determine the banks paying the highest CD rates. The customer applied for the CD directly to the institution, sometimes with the Fidelity sales agent's help. The sales agent calculated the difference between the yield on the FDIC-insured CD offered by the institution, and the yield based on the rate advertised by Fidelity. For example, if the Fidelity advertisement offered a 5.50 percent return on a $5,000 CD, and the banking institution paid 2.50 percent return, the difference would be 3 percent, or $150. Fidelity paid the customer that amount in a bonus check within seven days of the customer returning proof to Fidelity that the CD had been opened. FEP provided the funds for those bonus checks.

The Fidelity sales agents earned a commission equal to 40 percent of the commission received by FEP for the sale of the annuity. They earned nothing from selling a CD.

During the six-month period between February and August 2004, FEP sold nearly $36 million in annuities, on which it received commissions of between 6.75 percent and 9.75 percent. During the same period, Fidelity received over 16,000 telephone inquiries in response to its advertisements. Those inquiries produced about 2,900 personal appointments. As a result of the appointments, Fidelity arranged for the sale of 542 CD's and completed the sale of 952 annuities. About $20,000 per month in bonus checks were paid on those CD's.

### PROCEDURAL HISTORY

The DOC undertook an investigation in response to complaints by elderly investors that they had been misled by Fidelity's advertising. As a result of the investigation, the Commissioner issued a desist and refrain order against

Fidelity. The Commissioner found that the advertised investments were securities and that Fidelity had violated Corporations Code sections 25110, 25210, and 25401.

An administrative law judge too found the investment offered by Fidelity to be a security and upheld the desist and refrain order. The Commissioner adopted the administrative law judge's proposed decision with only minor changes.

Fidelity petitioned the superior court for a writ of administrative mandamus under Code of Civil Procedure section 1094.5. The superior court described Fidelity's program as "deserv[ing] the epithet 'bait and switch'" but identified the issue presented as whether Fidelity was selling a security. The court stated, "[i]f the entire plan is outrageously fraudulent, but does not involve the sale of a security, this petition must be granted." The court concluded the investment offered by Fidelity was not a security, granted the petition, and issued a peremptory writ of administrative mandamus ordering the Commissioner to set aside his decision.

The DOC filed a return to the peremptory writ and filed a notice of appeal from it on the same date.

STANDARD OF REVIEW

Because the relevant facts are undisputed, we independently review the superior court's decision to grant an administrative writ of mandamus. (*Evans v. Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122].)

DISCUSSION

I.  *California Securities Laws and Definition of a Security*

The offer or sale of securities in California must be qualified with the Commissioner or otherwise be exempt or not subject to qualification. (Corp. Code, § 25110.) Persons who offer to sell or purchase securities in California must obtain a certificate as a broker-dealer from the Commissioner unless they are otherwise exempt. (*Id.*, § 25210, subd. (a).) It is unlawful to offer or sell a security in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. (*Id.*, § 25401.) The DOC lacks jurisdiction to act with respect to a transaction or instrument

that is not a security. (See *Brooks v. State Personnel Bd.* (1990) 222 Cal.App.3d 1068, 1072 [272 Cal.Rptr. 292].)

■ Corporations Code section 25019 defines "security" by listing transactions and instruments deemed to be securities. The list is "expansive," but is not applied literally. (*People v. Figueroa* (1986) 41 Cal.3d 714, 734 [224 Cal.Rptr. 719, 715 P.2d 680].) Rather, the California Supreme Court has stated the critical question in resolving whether a transaction comes within the statutory definition of security is "whether [the] transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the literal language of the definition." (*Id.* at p. 735.) The purpose of the securities laws is " 'to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' " (*Id.* at p. 736.)

## II. *Whether the CD-plus-bonus Package Is an Investment Contract*

■ The parties here agree if the CD-plus-bonus package is a security, then it is a security in the form of an investment contract. (Corp. Code, § 25019 [security includes "investment contract"].) In determining whether a transaction is an investment contract, California courts have applied, either separately or together, two distinct tests: (1) the "risk capital" test described in *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815 [13 Cal.Rptr. 186, 361 P.2d 906], and (2) the federal test described in *SEC v. W.J. Howey Co.* (1946) 328 U.S. 293, 298–299 [90 L.Ed. 1244, 66 S.Ct. 1100] (*Howey*). (*People ex rel. Bender v. Wind River Mining Project* (1990) 219 Cal.App.3d 1390, 1400 [269 Cal.Rptr. 106]; *Moreland v. Department of Corporations* (1987) 194 Cal.App.3d 506, 513 [239 Cal.Rptr. 558] (*Moreland*).) A transaction is a security if it satisfies either test. (*Moreland, supra*, 194 Cal.App.3d at p. 513, fn. 3.)

### A. *The Risk Capital Test*

■ The CD-plus-bonus package is not a security under the risk capital test.[2] "The 'risk capital' test requires a consideration of the following factors: (1) whether funds are being raised for a business venture or enterprise; (2) whether the transaction is offered indiscriminately to the public at large; (3) whether the investors are substantially powerless to effect the success of the enterprise; and (4) whether the investors' money is substantially at risk because it is inadequately secured." (*Moreland, supra*, 194 Cal.App.3d at p. 519.)

---

[2] The DOC did not argue the risk capital test to the superior court, which did not mention that test in its decision. According to Fidelity, the DOC no longer uses the risk capital test.

Fidelity did not promote the CD-plus-bonus package to raise funds for a business venture or enterprise. All of the investors' funds were used to purchase CD's from institutions unrelated to Fidelity or FEP. The investors' funds were not substantially at risk because the CD's were FDIC insured— the investors' return was virtually guaranteed.

## B. *The Federal Test*

### 1. *Elements of the Federal Test*

■  Under the federal test, an investment contract consists of an investment of money in a common enterprise with the expectation of profits produced by the efforts of others. (*Howey, supra,* 328 U.S. 293, 298–299; see *SEC v. Edwards* (2004) 540 U.S. 389, 393 [157 L.Ed.2d 813, 124 S.Ct. 892].) This test is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." (*Howey, supra,* 328 U.S. at p. 299.)

The "touchstone" of the federal test "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." (*United Housing Foundation, Inc. v. Forman* (1975) 421 U.S. 837, 852 [44 L.Ed.2d 621, 95 S.Ct. 2051] (*Forman*).) "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds." (*Ibid.*)

The constituent parts of the transaction must be considered as a whole in deciding whether it is an investment contract. (*Hocking v. Dubois* (9th Cir. 1989) 885 F.2d 1449, 1458, fn. 7 (en banc).) "[F]orm should be disregarded for substance and the emphasis should be on economic reality." (*Tcherepnin v. Knight* (1967) 389 U.S. 332, 336 [19 L.Ed.2d 564, 88 S.Ct. 548].)

An investment scheme offering a fixed rate of return can be an investment contract subject to federal securities regulation. (*SEC v. Edwards, supra,* 540 U.S. 389, 397.) Our analysis therefore gives no weight to the fact Fidelity's CD-plus-bonus package paid a fixed rate of return.

### 2. *Whether the FDIC-insured CD Offered by Fidelity Is an Investment Contract*

■  The federal test "requires that the investor 'commit his assets to the enterprise in such a manner as to subject himself to financial loss.' " (*S.E.C. v. Rubera* (9th Cir. 2003) 350 F.3d 1084, 1090.) A CD insured by the FDIC is

not a security under the antifraud provisions of the federal securities laws because the investor is not subject to such financial loss. (*Marine Bank v. Weaver* (1982) 455 U.S. 551, 557–559 [71 L.Ed.2d 409, 102 S.Ct. 1220] (*Marine Bank*).)[3] In *Marine Bank*, the Supreme Court distinguished an FDIC-insured CD from a long-term debt in that "the purchaser of a certificate of deposit is virtually guaranteed payment in full." (*Id.* at p. 558.) Subjecting issuers of bank CD's to the antifraud provisions of the federal securities laws was unnecessary to protect investors because CD holders "are abundantly protected under the federal banking laws." (*Id.* at p. 559.)

Fidelity's advertising offered FDIC-insured CD's paying a higher rate of interest than that offered by banks. An investor purchased a CD from a bank that was unrelated to Fidelity.[4] Since the CD was FDIC insured, the investor did not risk losing the money invested. Fidelity paid the difference between the advertised interest rate and the rate of return paid by the bank with a bonus check earned upon presentation of proof the investor had opened a CD. Neither Fidelity nor FEP used the investors' funds generated from purchasing the CD's. Interest on the CD's was paid by the banking institutions issuing them. The bonus checks were not paid from earnings resulting from the use of the investors' funds because those who invested in the CD-plus-bonus package paid no money to Fidelity or FEP.

3. *Whether Fidelity's CD-plus-bonus Package, Considered as a Single Transaction, Is an Investment Contract*

In resolving whether the investment package here was an investment contract, we must consider the CD and the bonus as constituent parts of the same transaction rather than consider each separately. (*Hocking v. Dubois, supra,* 885 F.2d at p. 1458, fn. 7 (en banc).) What did Fidelity do that would transform an FDIC-insured CD into an investment contract? Two things, the DOC argues. First, Fidelity paid each investor a bonus, and "[t]he ability of Fidelity . . . to pay the bonuses is entirely dependent upon the continued success of FEP in selling annuities." Thus, the DOC argues, "the offers of the CD[']s plus bonuses by Fidelity . . . and the sale of annuities by FEP are completely intertwined and there is a common enterprise." Second, the DOC argues, Fidelity engaged in "significant prepurchase entrepreneurial and

---

[3] The Securities Exchange Act of 1934 and California Corporations Code define security to include "certificate of deposit for a security." (15 U.S.C. § 78c(a)(10); Corp. Code, § 25019.) This term does not refer to bank-issued CD's, but to instruments issued by protective committees in the course of corporate reorganizations. (*Marine Bank, supra,* 455 U.S. at p. 557, fn. 5.)

[4] "Investment" has been defined broadly to require only that "a person entrusted money or other capital to another." (See *People v. Smith* (1989) 215 Cal.App.3d 230, 236 [263 Cal.Rptr. 684].)

managerial activities," such as selecting Fidelity's advertised CD rate and identifying banking institutions offering the highest rates on FDIC-insured CD's.

### a. *Was Payment of the Bonus Dependent on the Success of Enterprise?*

As to its first point, the DOC urges us to follow *Safeway Portland Emp. Fed. Cr. Un. v. Wagner & Co., Inc.* (9th Cir. 1974) 501 F.2d 1120 (*Safeway*), in which the Ninth Circuit Court of Appeals concluded an investment package consisting of a CD plus bonus constituted an investment contract under the federal securities laws. As we shall explain, the investment package examined in *Safeway* was in fact substantially different from Fidelity's CD-plus-bonus package.

In *Safeway*, a securities broker/dealer engaged in brokerage of CD's in concert with one of its subsidiaries. (*Safeway, supra,* 501 F.2d at p. 1122.) The subsidiary, through independent money brokers, obtained borrowers willing to pay a premium to induce third parties to purchase CD's issued by specified banks. (*Ibid.*) The borrowers then would seek loans from those banks issuing the CD's. (*Ibid.*) The securities broker located investors to purchase the CD's by offering a bonus in the form of an additional rate of interest, to be paid from the premiums paid by the borrower. (*Ibid.*) The broker sold about $4 million in CD's, bearing interest at the rate of 7 1/2 percent, issued by a Texas bank insured by the FDIC. (*Ibid.*) A credit union purchased two CD's totaling $250,000. (*Ibid.*) The broker paid additional interest of 5/8 percent payable when the CD's matured.[5] (*Safeway*, at p. 1122.)

Examining the CD and bonus interest as a whole, the Ninth Circuit held the package was an investment of money in a common enterprise, even assuming the CD itself was not a security. (*Safeway, supra,* 501 F.2d 1120, 1123.) Two characteristics of the package were significant to the court's holding. First, the CD's were brokered. Thus, Safeway "was led to expect profit as the result of [the broker]'s efforts in obtaining the issuance of the

---

[5] The district court decision in *Safeway* provides this illuminating description of the investment scheme: "The record discloses a scheme whereby Wagner would solicit persons to purchase certificates of deposit in various banks, which would thereby obtain funds to lend to substandard borrowers willing to pay high rates of interest. These borrowers were willing to pay Wagner a commission for finding the deposits which made the loans possible. Wagner would then use part of the borrowers' commission or 'finder's fee' to pay the extra 5/8% interest which had been employed to induce purchasers to buy the certificates of deposit offered by the Wagner defendants. The remainder of the borrowers' fees were Wagner's profit. In short, the Wagner group acted as money brokers, and the plaintiff credit union was a source of money." (*Safeway Portland Emp. Fed. Cr. Un. v. C. H. Wagner & Co., Inc.* (D.Or. 1971) 335 F.Supp. 116, 117.)

CD[']s and in completing the transaction whereby [Safeway] would receive the bonus." (*Ibid.*) Second, the court observed, "the future payment of the bonus was dependent on the continued success and solvency of [the broker]." (*Ibid.*)

The *Safeway* court also noted the package was not issued or guaranteed by a bank. (*Safeway, supra,* 501 F.2d at p. 1124.) Based on the amount the credit union invested, the CD's it purchased would not have been FDIC insured. Thus, the soundness of the investment was related to the broker's efforts in locating banks willing to issue and able to repay the CD's. The banks' ability to repay the CD's in turn depended on the ability of the borrowers—also obtained by the broker—to repay the loans made possible by the issuance of the CD's.

Judge Sneed, in a concurring opinion, identified the reason why investments arising from such brokered funds should be regulated: "The primary abuse that flows from brokered funds is the encouragement it provides to banks to make unsafe loans." (*Safeway, supra,* 501 F.2d at p. 1124 (conc. opn. of Sneed, J.).) But, wrote Judge Sneed, "I have grave doubts, for example, that the 5/8 % bonus offered by [the broker] *alone* is sufficient to transform the *entire package* into a nonexempt investment contract." (*Id.* at p. 1125 (conc. opn. of Sneed, J.).) Rather, the investment contract designation was justified in that case because the representations and activities of the broker created an investment in a common enterprise. Judge Sneed concluded: "A certificate of deposit even when accompanied by a bonus under some circumstances may not constitute such an investment. The passivity of all but the issuing bank and its borrowers may reach a level that requires the rejection of the 'investment contract' characterization." (*Ibid.*)

While the investment in *Safeway* and the investment in this case appear facially similar, in substance they are very different. Key to understanding *Safeway* is that the brokers solicited both the CD purchasers and the borrowers willing to pay a premium to induce third parties to purchase CD's issued by the lending banks. The banks used the proceeds from the CD's to lend money to the borrowers, which would repay the loans with a premium used to pay the investors the additional interest on the CD's and pay the brokers' commission. Thus, the uninsured CD's were fully integrated into the enterprise, the viability of which depended on the brokers' entrepreneurial and investment skills.

Here, in contrast, the substance of the Fidelity package was the investor purchased an FDIC-insured CD and was paid a bonus by Fidelity as inducement to let a Fidelity sales agent pitch annuities. To earn the bonus, the investor had to contact Fidelity, make an appointment to meet with a sales

agent, travel to a Fidelity office to meet with the agent, and (possibly) listen to the agent's sales pitch. The CD's were not integrated with Fidelity's activities. None of the investor's funds were paid to Fidelity, and Fidelity used none of the investor's funds to generate profits used to pay the bonus. (See *Forman, supra,* 421 U.S. at p. 852 ["By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, . . . or a participation in earnings resulting from the use of investors' funds"].) The bonus was not paid on maturity of the CD, but was earned immediately upon proof the investor had opened a CD. The risk Fidelity would be unable to pay the bonus due, for example, to insolvency, was the same risk any creditor takes when earning a fee in advance of payment.

In *Noa v. Key Futures, Inc.* (9th Cir. 1980) 638 F.2d 77 (*Noa*), the Ninth Circuit concluded such risk of insolvency faced by a creditor does not create an investment contract. In *Noa,* Key Futures offered silver bars for sale and, in high-pressure sales efforts, touted the bars as a superior investment. (*Id.* at p. 79.) The investor entered into a contract to purchase a given quantity of silver at a given price. (*Ibid.*) Key Futures guaranteed the purity of the bars and agreed to initiate their delivery upon full payment by the investor. (*Ibid.*) Key Futures agreed to store the silver bars at no expense for one year, and represented it would buy the silver back from the investors at any time upon request at the spot market price quoted in the Wall Street Journal. (*Ibid.*)

The Ninth Circuit held this transaction did not create an investment contract because the investors' profits depended on the fluctuations in the silver market, not on Key Futures's managerial expertise or efforts. (*Noa, supra,* 638 F.2d at p. 79.) The investor made the decisions to buy and sell. (*Ibid.*) The silver market was national, and was not dependent on Key Futures. (*Id.* at p. 80.) Purchase of the silver and provision of free storage did not amount to " 'undeniably significant' " efforts by Key Futures. (*Ibid.*) The *Noa* court acknowledged the investor bore the risk that Key Futures might become insolvent during the 30-day period in which delivery of the silver bars was initiated. (*Ibid.*) The *Noa* court also acknowledged the *Safeway* court "did mention the continued success and solvency of the defendant as one factor indicating that the investor was involved in a common enterprise with the defendant and that the investor expected profits to come from the efforts of others." (*Ibid.*) However, with respect to the investment in silver bars, the *Noa* court stated such risk "was that which any buyer takes when he pays in advance for goods to be delivered in the future." (*Ibid.*)

The Ninth Circuit reached a similar conclusion in *S.E.C. v. Belmont Reid & Co., Inc.* (9th Cir. 1986) 794 F.2d 1388 (*Belmont Reid*). In that case, the promoters held partially developed leasehold interests in purportedly gold-bearing land. (*Id.* at p. 1389.) They sought to raise capital by offering

investors the ability to purchase gold coins to be minted from gold extracted from the land. (*Ibid.*) Under one plan, the investors were required to prepay for the coins in advance of their delivery. (*Ibid.*) The Ninth Circuit recognized that the promoters might fail to deliver the coins and the success of the investment depended on their ability to extract sufficient quantities of gold. "Viewed from this angle," the court stated, "it is easy to assert that the failure or success of the enterprise in which the prepayment purchaser was engaged depended significantly on the managerial efforts of [the promoters] and for that reason the third requirement of the *Howey* test is met." (*Id.* at p. 1391.)

█ In this case, an investor earned the bonus after meeting with a Fidelity sales agent and submitting proof of having opened a CD at a listed financial institution. Fidelity paid the bonus a few days later. In that brief time period, it was possible Fidelity or FEP might become unable to pay the bonus. Fidelity's and FEP's ability to pay the bonuses depended upon the ability of the enterprise to generate income from the sales of annuities. But whenever anyone purchases goods in advance of delivery, sells goods or provides services in advance of payment, or lends money, repayment or delivery of goods depends on the viability of the debtor's enterprise. As the *Noa* and *Belmont Reid* courts recognized, such dependence does not alone satisfy the federal test and create an investment contract.

### b. Was Payment of the Bonus Dependent on Fidelity's Managerial and Entrepreneurial Efforts?

█ The other factor which the DOC argues turned the CD into an investment contract was Fidelity's managerial and entrepreneurial efforts. We agree with the DOC a court must look to both prepurchase and postpurchase activities in deciding whether an investment is a nonexempt investment contract. We decline to follow *S.E.C. v. Life Partners, Inc.* (D.C. Cir. 1996) 318 U.S. App. D.C. 302 [87 F.3d 536, 548], in which the court, drawing a distinction between prepurchase and postpurchase activities, concluded: "[P]re-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others, and . . . ministerial functions should receive a good deal less weight than entrepreneurial activities."

Rather, we believe "[s]ignificant pre-purchase managerial activities undertaken to insure the success of the investment may also satisfy *Howey*." (*S.E.C. v. Mutual Benefits Corp.* (11th Cir. 2005) 408 F.3d 737, 743.) "Courts have found investment contracts where significant efforts included the prepurchase exercise of expertise by promoters in selecting or negotiating the price of an asset in which investors would acquire an interest." (*Id.* at p. 744; accord, *S.E.C. v. Eurobond Exchange, Ltd.* (9th Cir. 1994) 13 F.3d 1334.)

Fidelity's prepurchase efforts were not, however, either significant or entrepreneurial. Each day, Janet Reiswig conducted Internet research and, based on her research, prepared a list of banks paying the highest rates on FDIC-insured CD's and determined Fidelity's advertised rate. The investors decided from which banks to purchase the CD's, which were FDIC insured.

Those prepurchase efforts by Fidelity did not require specialized skills or significant discretionary decisions typically associated with investment contracts. For example, in *S.E.C. v. Mutual Benefits Corp., supra*, 408 F.3d at pages 744–745, the court held investments in viatical settlements[6] involved substantial prepurchase entrepreneurial and managerial skills because the investors relied on the promoters to identify terminally ill patients, select insurance policies, negotiate and pay premiums, and perform life expectancy evaluations "critical to the success of the venture." (See also *S.E.C. v. Rubera, supra*, 350 F.3d at p. 1092 [promoters of investment in pay telephones selected the locations for the telephones, maintained the telephones, paid utility bills and obtained regulatory certificates]; *Glen-Arden Commodities, Inc. v. Costantino* (2d Cir. 1974) 493 F.2d 1027 [promoters sold whiskey warehouse receipts and provided expertise in the selection of whiskey and casks, finding a market for the whiskey, and arranging storage and insurance].)

Fidelity's efforts were a far cry from those in *Safeway*, where the promoters served as money brokers directly obtaining not only the CD's, but also the borrowers for the banks issuing the CD's. Fidelity's relatively passive task of preparing a daily list of banking institutions offering the highest rates on FDIC-insured CD's was at the level which, as Judge Sneed commented in his *Safeway* concurrence, "requires the rejection of the 'investment contract' characterization." (*Safeway, supra*, 501 F.2d at p. 1125 (conc. opn. of Sneed, J.).)

This case is similar to *Noa* because the amount of an investor's profit depended on the fluctuations in interest rates for CD's, which was not dependent on Fidelity's managerial expertise or efforts. (See *Noa, supra*, 638 F.2d at p. 79.) As in *Noa*, in which the investors decided when to sell the silver bars, here, the investor decided from which bank to purchase the CD.

---

[6] "A viatical settlement is a transaction in which a terminally or chronically ill insured ('viator') sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value. Viatical settlement providers purchase the policies from individual viators. Once purchased, these viatical settlement providers typically sell fractionalized interests in these policies to investors." (*S.E.C. v. Mutual Benefits Corp.* (S.D.Fla. 2004) 323 F.Supp.2d 1337, 1338, fn. omitted.)

### 4. *Regulatory Purpose of Securities Laws*

Finally, we again examine the CD-plus-bonus package as a whole and ask whether it falls within the regulatory purpose of California's securities laws " 'to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' " (*People v. Figueroa, supra*, 41 Cal.3d at p. 736.)

The CD-plus-bonus package "is not the type of instrument that comes to mind when the term 'security' is used and does not fall within 'the ordinary concept of a security.' " (*Marine Bank, supra*, 455 U.S. at p. 559.) Securities laws are not necessary in the usual case to protect the public regarding FDIC-insured CD's because their payment is virtually guaranteed. The CD and bonus package here required the investors to purchase a CD from a bank that was unassociated with Fidelity or FEP, and therefore neither Fidelity nor FEP used any of the invested funds. The securities laws are unnecessary to protect the public from misfeasance or malfeasance in Fidelity's efforts in preparing the daily list of banks offering the highest rates on FDIC-insured CD's and setting the advertised return. Those tasks involved no special skills typically associated with securities.

█    The bonus was, in essence, a gift or reward the customer received for meeting with a Fidelity sales agent and was earned on submission of proof the investor had purchased a CD. The revenues used to pay the bonuses were generated from the sale of annuities, so payment was in a sense dependent on the viability of the enterprise. The same can be said, however, whenever money is earned before it is paid; that is, in any unsecured creditor relationship. Thus, characterizing Fidelity's CD-plus-bonus package as an investment contract under Corporations Code section 25019 would inject the securities laws into ordinary unsecured creditor relationships.

What is the DOC's real concern here? We perceive the DOC's concern is not with the CD-plus-bonus package per se, but with Fidelity using the package as a come-on to allegedly mislead investors into purchasing undesirable annuities. The trial court characterized the CD-plus-bonus package as a classic bait and switch used to bring potential customers before Fidelity sales agents, who could then try to sell *annuities*. Both sides agree the sale of annuities is subject to regulation by the Department of Insurance. (See Ins. Code, §§ 790 et seq., 10509 et seq.)

## Disposition

The judgment is affirmed. Respondents to recover costs on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.